UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| TEAM HEALTH HOLDINGS INC., ET AL. | § § § | |
| v. | § § | Case No. 5:22-cv-143-RWS-JBB |
| IRONSHORE SPECIALTY INSURANCE COMPANY AND ALLIANT INSURANCE SERVICES, INC. | § § § § | |

## <u>ORDER</u>

The above-referenced case was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. The following pending motions are before the Court:

> **Ironshore Specialty Insurance Company's Motion to Transfer and Supporting Memorandum of Law (Dkt. No. 16); and**

> **Defendant Alliant Insurance Services Inc.'s Motion for Joinder in Plaintiffs' Response to Ironshore's Motion to Transfer (Dkt. No. 25).**

The Court, having carefully considered the relevant briefing and hearing arguments of counsel March 21, 2023, **DENIES** Ironshore's motion to transfer and **GRANTS** Alliant's motion for joinder in TeamHealth's response to Ironshore's motion to transfer.

## I. BACKGROUND

### A.    Factual background

This is an insurance coverage dispute. Plaintiffs Team Health Holdings, Inc., TeamHealth, LLC (f/k/a Team Health, Inc.), Team Finance, LLC, AmeriTeam Services, LLC, HCFS Health Care Financial Services, LLC, and Quantum Plus LLC (d/b/a TeamHealth West) (collectively, "TeamHealth") filed the above-entitled and numbered cause of action against Defendant Ironshore Specialty Insurance Company ("Ironshore") and alternatively against its insurance broker,

1

Defendant Alliant Insurance Services, Inc. ("Alliant"). TeamHealth seeks reimbursement from an insurance policy which it purchased from Ironshore to cover liabilities in excess of its purchased AIG Policy. TeamHealth's alleged loss arises out of the settlement of an underlying investigation demand and litigation against TeamHealth in the Eastern District of Texas (the *Hernandez* Action described in further detail below).

## 1.       The parties

Team Health Holdings, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Knoxville, Tennessee. Amended Complaint, Dkt. No. 43, ¶ 10. TeamHealth is a collection of integrated healthcare companies with operations nationwide, including within the Eastern District of Texas. *Id.*, ¶ 24.

Defendant Ironshore is a corporation organized under the laws of Arizona with its principal place of business in Massachusetts. *Id.*, ¶ 18. Defendant Alliant is a corporation organized under the laws of California with its principal place of business in California. *Id.*, ¶ 19. TeamHealth alleges Alliant sold the AIG and Ironshore policies from Alliant's office in Texas to insure risk in Texas. *Id.*, ¶ 21. TeamHealth further alleges Alliant entered into the below "Agreement" through an officer in the Alliant office in Texas. *Id.*

## 2.       TeamHealth's Agreement with Alliant

On June 2, 2008, Team Health, Inc. ("THI") (now Team Health, LLC) and Alliant entered into an agreement entitled "Agreement," whereby Alliant was to provide insurance and consulting services solely to THI in respect to certain insurance coverages. *Id.*, ¶ 28; *see also* Dkt. No. 43-1 (the "Agreement"). The Agreement provides, among other things, that Alliant will "[m]anage [the] claim reporting process" for TeamHealth.  *Id.*, ¶ 27; *see also* Dkt. No. 43-1 at 9. The Agreement with Alliant included lines of coverage for "Billing and Errors Omissions" and "Miscellaneous

Errors and Omissions." Dkt. No. 43-1 at 11. For the insurance year 2016-2017, Alliant recommended and TeamHealth agreed to purchase two layers of specialized Professional Liability Insurance, including $10,000,000 of primary coverage from AIG and $10,000,000 of excess coverage from Ironshore. Dkt. No. 43, ¶ 29.

### 3.   AIG and Ironshore Policies

#### *AIG Policy*

AIG issued Policy No. 01-285-30-91, which is a primary professional liability policy for the policy period of March 31, 2016 to March 31, 2017 ("AIG Policy," Dkt. No. 43-2). *Id.*, ¶ 30. The AIG Policy has a limit of $10,000,000 and a retention of $1,000,000. *Id.*, ¶¶ 31-32.

The AIG policy requires written notice to be provided "as soon as practicable" after certain specified events but in all events "no later than either: (1) forty-five (45) days after the end of the **Policy Period**; or (2) the end of any applicable **Discovery Period.**" Dkt. No. 43-2 at 12, AIG Policy, General Terms and Conditions, 6(a) (emphasis original). The AIG Policy also prohibits TeamHealth, "without the Insurer's prior written consent," to (1) "assume any financial obligation or incur any cost unless specifically allowed to settle any Claim on behalf of all Insureds within the retention pursuant to a Coverage Section;" or (2) "take any action, or fail to take any required action which prejudices the Insurer's rights under this policy." *Id.* at 13, General Terms and Conditions, 7 (emphasis removed).

The AIG Policy contains a Dispute Resolution Process which provides that no "judicial or arbitration proceeding shall be commenced until at least 90 days after the date the non-binding mediation shall be deemed concluded or terminated." *Id.* at 16, General Terms and Conditions, 15.

### *Ironshore Policy*

Ironshore issued an E&O – Miscellaneous Professional Excess Liability Insurance Policy ("Ironshore Policy"), No. 002711900, for the policy period of March 31, 2016-March 31, 2017, to Team Health Holdings, Inc. Dkt. No. 43, ¶ 35, *see also* Dkt. No. 43-3. The Ironshore Policy, subject to its terms, definitions, exclusions and limitations, follows form to the terms, definitions, conditions, exclusions and limitations of AIG policy. Dkt. No. 43-3 at 4, Declarations, Item 3; *see id.* at 6 (I), Insuring Agreement. Item 3 provides the Followed Policy as "Specialty Risk Protector" and the Insurer as "AIG Specialty Insurance Company." Dkt. No. 43-3 at 4, Declarations, Item 3.

The Ironshore Policy further includes a notice provision specifying how TeamHealth must provide notice of claims to Ironshore. *Id.* at 6 (IV), Policy Terms, C. The April 19, 2016 letter with the attached Ironshore Policy is addressed to Alliant's James Tolfree in New York. Dkt. No. 43-3 at 2. The Ironshore Policy expressly states in the letter and on the Declarations Page: "This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as a surplus lines coverage pursuant to the Tennessee insurance statutes." *Id.* at 3-4. Following the first above statement, the letter provides the following additional information:

Surplus Lines Broker Name: Alliant Insurance Services Houston, LLC

Address of the Licensee: 5444 Westheimer, Suite 900, Houston, Texas 77056

*Id.* at 3. However, Item 10 of the Ironshore Policy lists the broker address as James Tolfree with Alliant's New York address. *Id*. at 5.

**4.    Underlying *Hernandez* Action**

On April 25, 2016, certain Relators filed a complaint in the United States District Court for the Eastern District of Texas, pursuant to the *qui tam* provisions of the False Claims Act, captioned *United States ex rel. Hernandez, et al. v. Team Health Holdings, Inc., et al*., No. 2:16-cv-00432-

4

JRG (the "*Hernandez* Action"). Relators alleged claims against TeamHealth relating to billing for emergency services that TeamHealth now alleges fell within the scope of coverage provided by the AIG Policy and followed by the Ironshore Policy. Dkt. No. 43, ¶ 46.

On October 25, 2016, TeamHealth received a Civil Investigative Demand ("Demand") from the U.S. Department of Justice related to the *Hernandez* Action. *Id.*, ¶ 47. TeamHealth alleges it provided a copy of that Demand to Alliant in 2016 and a copy of the *Hernandez* Complaint in 2018. *Id.*, ¶¶ 51-53.

TeamHealth, AIG, and Ironshore agreed to renew the AIG Policy and Ironshore Policy again for the 2017-18 policy years. Dkt. No. 43, ¶ 42. TeamHealth alleges Ironshore had knowledge of the *Hernandez* Action before confirming renewal and knew or should have known of the Demand in 2016 and 2017. *Id.*, ¶¶ 43, 49; *see also* Dkt. No. 43-5 (on June 5, 2017, TeamHealth, via Alliant, confirmed and provided loss runs of claims to Ironshore, and those loss runs included the Demand); *see also* Dkt. No. 43-6 (in November 2017, Alliant again provided Ironshore with loss runs which included the Demand).

On April 7, 2021, TeamHealth wrote to Ironshore about the *Hernandez* Action and advising that it anticipated a loss in connection with the *Hernandez* Action that exceeded the underlying coverage. Dkt. No. 43-8. On April 13, 2021, Ironshore acknowledged receipt of the April 7, 2021 correspondence and assigned a claim handler to the matter. Dkt. No. 43-9.

On June 14, 2021, the parties involved in the *Hernandez* Action entered into a Settlement Agreement that provided, in relevant part, that TeamHealth would pay the United States $42,500,000. Ironshore's Answer and Affirmative Defenses to Plaintiffs' Amended Complaint with Counterclaim, Dkt. No. 85, ¶¶ 46, 49. Ironshore subsequently denied coverage under the

Ironshore Policy for, among other reasons, TeamHealth's alleged failure to timely notify or seek consent from Ironshore before entering a settlement. Dkt. No. 43-11.

**5.      Parties' unsuccessful mediation**

Under the AIG Policy, to which Ironshore follows form, Team Health and Ironshore were required to engage in a non-binding mediation before filing any coverage litigation. Dkt. No. 43-2, AIG Policy at 16, General Terms and Conditions, 15. The provision provides as follows: "Notwithstanding the foregoing, no such judicial or arbitration proceeding shall be commenced until at least 90 days after the date the non-binding mediation shall be deemed concluded or terminated." *Id.* The parties unsuccessfully mediated this dispute, and the mediation was completed on August 8, 2022. Dkt. No. 75 (Transcript) at 37:11-17.

**B.      The two lawsuits**

**1.      Texas Lawsuit**

TeamHealth filed suit in this Court  (the "Texas Lawsuit") on November 5, 2022 at 11:00 p.m. Central Time, seeking a declaration that it is entitled to coverage under the Ironshore Policy in connection with the *Hernandez* Action. TeamHealth's complaint also includes claims against Ironshore related to its alleged improper denial of coverage in connection with the *Hernandez* Action, as well as alternative claims against Alliant, TeamHealth's insurance broker, for breach of contract, professional negligence, breach of fiduciary duty, and indemnity. If Ironshore is successful in avoiding its coverage obligations for the *Hernandez* Action, "TeamHealth alternatively pleads Ironshore's ability to avoid coverage would be based upon breaches of Alliant's obligations to manage TeamHealth's claims, including breach of contract for failing to provide timely notice to Ironshore as Ironshore alleges was technically required." Dkt. No. 43, ¶ 102.

2.      **Tennessee Lawsuit**

On November 7, 2022 at 2:42 p.m. Eastern Time, Ironshore filed *Ironshore Specialty Insurance Company v. Team Health Holdings, Inc.*, No. 3:22-cv-00390-TRM-DCP (E.D. Tenn.) in the United States District Court for the Eastern District of Tennessee (the "Tennessee Lawsuit"). The Tennessee Lawsuit related to the same insurance coverage dispute at issue in this litigation. Specifically, Ironshore sought a declaratory judgment that TeamHealth did not satisfy certain conditions precedent to coverage under the Ironshore Policy and that coverage does not exist for TeamHealth's claims related to the *Hernandez* Action.

On December 5, 2022, TeamHealth filed in the Tennessee Lawsuit a motion to dismiss Ironshore's claims pursuant to the first-to-file rule or, in the alternative, to transfer venue to the Eastern District of Texas under 28 U.S.C. § 1404. On December 7, 2022, Ironshore filed in this case a motion to transfer to the Eastern District of Tennessee pursuant to 28 U.S.C. § 1404(a). Dkt. No. 16. The Court conducted a hearing on Ironshore's motion on March 21, 2023. Two days later, TeamHealth filed a Notice of Order Granting TeamHealth's Motion to Dismiss in Tennessee Lawsuit.[1] *See* Dkt. No. 69.

## II. IRONSHORE'S MOTION

In its current motion, Ironshore requests this case be transferred to the Eastern District of Tennessee pursuant to 28 U.S.C. § 1404(a). Dkt. No. 16. The motion focuses on the private and public interest factors and contends the alleged events and omissions giving rise to the claim for which TeamHealth sues all appear to arise in Tennessee, "the state from which Team Health made its demand to Ironshore, and to which Ironshore responded." *Id.* at 7 (citing Orig. Compl, ¶¶ 72-

---

[1] Ironshore is in the process of filing a Motion for Reconsideration of the March 23, 2023 Order entered by the United States District Court for the Eastern District of Tennessee ("the Tennessee court"), requesting the Tennessee court transfer the Tennessee Lawsuit to this Court instead of dismissing it. *See* Dkt. No. 80.

75, 77-80, 82-87, and 88-99; also citing *id.*, Exs. 8-11 (claims correspondence between Team Health and Ironshore beginning April 7, 2021)). According to Ironshore, TeamHealth's conduct, which gave rise to the underlying *Hernandez* Action, for which TeamHealth seeks coverage "emanated from [TeamHealth's] principal place of business" in Knoxville and Brentwood, Tennessee. *Id.* at 8.

TeamHealth opposes Ironshore's motion, asserting application of the "well-established first-to-file rule requires that the Texas Lawsuit proceed over the Tennessee Lawsuit, and Ironshore's Motion to Transfer should be denied on that basis alone." Dkt. No. 17 at 1. In the event the Court considers the convenience factors under § 1404(a), TeamHealth argues Ironshore has not met its burden of proving that transfer is warranted.

Alliant filed a motion for joinder in TeamHealth's opposition to Ironshore's motion to transfer, requesting that Ironshore's motion to transfer be denied. Alliant's motion is granted, and the Court considers Alliant's arguments herein.[2]

### III. THRESHOLD ISSUE: "FIRST-TO-FILE" RULE

The parties dispute which case should be considered the first filed, and how that determination affects the transfer analysis under § 1404(a). The relevant facts are not disputed: The AIG Policy contains a dispute resolution provision that provides that no judicial or arbitration proceeding "shall be commenced until at least 90 days after the date the non-binding mediation shall be deemed concluded or terminated." Dkt. No. 14 (quoting AIG Policy at 15) (emphasis

---

[2] Following the hearing, the Court granted Alliant's Motion to Bifurcate and Partially Abate Discovery (Dkt. No. 76), ordering that trial of the "Broker Claims . . . as well as any related third-party insurance-broker liability claims, are bifurcated and will proceed in a separate trial, subsequent to that relative to the Coverage Claims, including the declaratory, breach of contract and bad faith claims contained in Counts I-IV against Ironshore." Dkt. No. 79 at 1-2. Although the trial of the Broker Claims against Alliant have been bifurcated, Alliant remains in this case. During the period of abatement, Alliant shall continue to act as an active participant making Disclosures, making Additional Disclosures, complying with the Agreed E-Discovery Order, responding to fact discovery, including answering interrogatories and requests for admission, production of documents, and presentation of employees and other representatives for depositions and trial relative to the Coverage Claims against Ironshore. *Id.* at 2.

removed). Ironshore and TeamHealth mediated the coverage dispute on August 8, 2022, and TeamHealth filed this case at 11:00 p.m. Central Time, November 5, 2022 (i.e., the 89th day after mediation), which corresponds to 12:00 a.m. November 6, 2022, Eastern Time (i.e., the 90th day after mediation).

Ironshore relies on the central time zone to conclude that TeamHealth's lawsuit was filed (at least) one day early, and that as such, the equitable course of action is to treat *Ironshore's* November 7, 2022 Tennessee lawsuit as the first filed lawsuit (or at least treat both lawsuits as simultaneously filed for the purposes of the transfer analysis). Dkt. No. 16 at 13-15. TeamHealth responds that a 12:00 a.m. eastern time zone filing corresponds to 90 days after mediation and thus complies with the AIG Policy. Dkt. No. 17 at 4-5. Thus, according to TeamHealth, there is no need to perform the traditional balancing analysis under § 1404(a) because the first-to-file rule prioritizes the Texas Lawsuit over the Tennessee Lawsuit. *Id.* at 9-10.

Ironshore's motion requests transfer under § 1404(a), not the first-to-file rule, so the Court will conduct the traditional balancing analysis under that statute. And given the situation here— that the Tennessee lawsuit was filed later in time than the Texas lawsuit—the parties' dispute about the effect of the first-to-file rule, including arguments concerning time zones and equity principles in play, is more properly addressed by the Tennessee court. *See Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir.1999) ("Under the first-to-file rule, when related cases are pending before two federal courts, ***the court in which the case was last filed*** may refuse to hear it if the issues raised by the cases substantially overlap." (emphasis added)).

Indeed, the Tennessee court recently granted TeamHealth's Motion to Dismiss or, in the Alternative, Motion to Transfer Venue which was filed in the Tennessee Lawsuit. *See* Dkt. No. 69. The Tennessee court concluded, in relevant part, that

> The dispute-resolution provisions of the AIG Policy include a ninety-day cooling off period after the conclusion of unsuccessful mediation. . . . The parties do not dispute that mediation concluded unsuccessfully on August 8, 2022, meaning that, under the contractually bargained for provisions of the policies, neither party was permitted to file a coverage-dispute lawsuit until November 6, 2022. . . . Team Health is a Delaware corporation with its principal place of business in Knoxville, Tennessee, which is located in the Eastern Time Zone. . . .  While the Court is not convinced that Eastern Time is the "controlling" time under the terms of the policies as Team Health argues, its decision to file at 12:00 a.m. Eastern Time in a court located in the Central Time Zone is not foreclosed by the ninety-day cooling-off provision in the AIG Policy. As a result, Team Health was permitted to file their complaint against Ironshore at that time, and equitable considerations do not require the Court to disregard the first-to-file rule in this case. Accordingly, the Court will **GRANT** Team Health's motion to dismiss.

*Id.* (emphasis original). To the extent necessary to comment on this well-reasoned analysis, the undersigned agrees that Ironshore presents no persuasive argument that the "90 day" time period in the AIG Policy is affected by the time zone of the court in which Ironshore chose to file its suit. Accordingly, the Court will turn to the 28 U.S.C. § 1404(a) arguments.

## IV. MOTION TO TRANSFER
## PURSUANT TO 28 U.S.C. § 1404(a)

### A.     Applicable law

Title 28, Section 1404(a) of the United States Code provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." A district court has broad discretion in deciding whether to order a transfer. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) ("*Volkswagen II*"). The Supreme Court of the United States has noted § 1404(a) is intended to place discretion in the district court to adjudicate motions to transfer according to an "individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988); *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964); *see also*

*In re Planned Parenthood Fed'n of Am., Inc.*, 52 F.4th 625, 632 (5th Cir. 2022) (reiterating that district courts have broad discretion in deciding motions to transfer).

The transfer analysis proceeds in two parts. First, the district court must ask whether the case "might have been brought" in the destination venue. 28 U.S.C. § 1404(a).

Second, the district court must weigh the four private interest factors and four public interest factors set forth in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) to determine whether the destination venue is "clearly more convenient than the venue chosen by the plaintiff:"

> The private interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive.
>
> The public interest factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law.

*Planned Parenthood*, 52 F.4th at 630 (quoting *Volkswagen II*, 545 F.3d at 315) (quotations omitted in *Planned Parenthood*)). In weighing these factors, no one consideration "can be said to be of dispositive weight." *Id.* (quoting *Volkswagen II*, 545 F.3d at 315). The *Gilbert* factors "are not necessarily exhaustive or exclusive." *Id.* (quoting *Volkswagen II*, 545 F.3d at 315).

The Fifth Circuit has been careful to emphasize that district courts should not merely engage in a "raw counting" exercise that tallies up the factors favoring transfer and the factors militating against transfer. *In re Radmax*, 720 F.3d 285, 290 n.8 ("We do not suggest—nor has this court held—that a raw counting of the factors in each side, weighing each the same and deciding transfer only on the resulting 'score,' is the proper methodology.")). Instead, the court must make factual determinations to ascertain the degree of actual convenience, if any, and whether such rises to the level of "clearly more convenient." *See id.* Where the present and proposed forums are both

11

roughly similar in terms of convenience, courts should not conclude that the proposed transferee forum is "clearly more convenient." *Id*. (quoting *Volkswagen II*, 545 F.3d at 315).

The Fifth Circuit recently reiterated that "[w]hen the transferee venue is not clearly more convenient than the venue chosen by the Plaintiff, the Plaintiff's choice should be respected." *Def. Distributed v. Bruck*, 30 F.4th 414, 433 (5th Cir. 2022) (quoting *Volkswagen II*, 545 F.3d at 315). This requires more than showing the proposed forum is "more likely than not" to be more convenient, or only a showing that the transferee forum is more convenient for the defendant:

> When a defendant is haled into court, some inconvenience is expected and acceptable. Assuming that jurisdiction exists and venue is proper, the fact that litigating would be more convenient for the defendant elsewhere is not enough to justify transfer. In other words, the standard is not met by showing one forum is more likely than not to be more convenient, but instead the party must adduce evidence and arguments that clearly establish good cause for transfer based on convenience and justice.

*Id.* (generally citing *Volkswagen II*, 545 F.3d at 314-315).

## B.   Analysis

The parties do not dispute that this action might have been brought in the Eastern District of Tennessee, meeting the threshold requirement for transfer under § 1404(a).

Turning to the private and public factors, the resolution of three issues that permeate several factors prevents Ironshore from carrying its burden. First, most of Ironshore's reasons to transfer are based on the alleged convenience for TeamHealth to litigate in Tennessee. As TeamHealth explained, it made the relevant determinations regarding its own convenience when it chose to file in the Eastern District of Texas. *See* Dkt. No. 17 at 12; *see also* Dkt. No. 75 (Transcript) at 32:4-10. It will be the rare case that a movant sill succeed in disturbing a plaintiff's choice of venue by showing the plaintiff erred in calculating its own convenience. *See, e.g.*, *Alacritech Inc. v.*

*Centurylink, Inc.*, No. 2:16-cv-693, Dkt. No. 356, at 8 n.4 (E.D. Tex. Sep. 19, 2017) (noting that a plaintiff can waive any inconvenience stemming from its forum selection).

Second, Ironshore discounts the general relevance of the Texas-based evidence and attorneys from the underlying *Hernandez Action* to TeamHealth's current contract and bad faith claims against Ironshore. *See* Dkt. No. 17 at 3, 14; *see also* Dkt. No. 75 (Transcript) at 21:8-23 (Ironshore arguing this case fundamentally is a "breach of contract case" that has "to do with TeamHealth's personnel in . . . Tennessee"); 52:23-54:3 (TeamHealth arguing the relevance of Texas witness' testimony regarding the fees and costs from the underlying *Hernandez* Action), 59:14-60:25 (similar), 77:6-78:17 (Ironshore arguing the underlying defense counsel and bad faith claim is a "red herring" because the instant dispute "turn[s]" on the contract issues arising from TeamHealth employees in Tennessee). While Ironshore's focus on whether TeamHealth complied with the notice provision (which presumably involved TeamHealth employees in Tennessee) is understandable, the Court has no basis to ignore the possible relevance of Texas-based evidence related to the *Hernandez* Action, including the counsel, costs, and fees associated with that action. That evidence, which weighs against transfer, is considered in the analysis below.

Third, co-defendant Alliant explained that this Court would be a more convenient forum due to its Texas-based employees and witnesses. Dkt. No. 25 at 2-3. While Ironshore expresses doubt about the location of the relevant Alliant personnel (Dkt. No. 34 at 1-2), Alliant credibly explained it is concerned about the convenience of its employees, who, based upon its "investigation to date," are all in Texas. Dkt. No. 25 at 2; Dkt. No. 75 (Transcript) at 65:10-66:20 (providing details establishing that the policy was serviced from the Houston office). As explained below, this evidence further weighs against transfer.

1.    **Private interest factors**

(a) Sources of Proof

The ease of access to sources of proof factor considers documents and physical evidence as opposed to witnesses. *Atlas Glob. Techs. L.L.C. v. TP-Link Techs. C*o., No. 2:21-CV-430-JRG-RSP, 2022 WL 18584501, at *6 (E.D. Tex. Dec. 28, 2022), *report and recommendation adopted*, No. 2:21-CV-00430-JRG-RSP, 2023 WL 1478451 (E.D. Tex. Feb. 2, 2023) (citing *Volkswagen II*, 545 F.3d at 315). While the physical location of such sources of proof remains relevant (*Volkswagen II*, 545 F.3d at 316), "[t]he location of evidence bears much more strongly on the transfer analysis when, as in *Volkswagen*, the evidence is physical in nature." *Planned Parenthood*, 52 F.4th at 630 (citing *Volkswagen II*, 545 F.3d at 316–17) (not finding any error in a district court's conclusion that "electronic" evidence was "equally accessible in either forum").

Regarding this factor, Ironshore generally references "communication related to the coverage for the *Hernandez* Action" that came from TeamHealth personnel located at its Knoxville, Tennessee office. Dkt. No. 16 at 8. Ironshore does not specifically address the existence of any other relevant sources of proof in Tennessee.

Neither TeamHealth nor Alliant address this factor in their briefing. But because Alliant indicated in its joinder to TeamHealth's opposition that "the handling of the claim at issue" was in Texas, Dkt. No. 25 at 2, during the hearing, the undersigned asked Alliant's counsel about the location of Alliant's sources of proof:

> THE COURT: . . . If you expect the Houston office to be where the majority of the witnesses relevant to Alliant's case would be, would you also expect the Houston office [to] contain the documents related to those witnesses and their sources of proof for this case?
>
> COUNSEL: To some degree. I don't want to commit as to where our ESI is stored, where the server might be located. But, I mean, we're going to produce our documents in this case. It's not going to be an issue whether it's in Tennessee or

whether it's in Texas. I mean, we're going to produce the documents that are relevant to our claims.

THE COURT: You're most concerned about the convenience of your witnesses.

COUNSEL: That's why we joined the [opposition to] the motion because it's going to be substantially easier to get our witnesses here. They're not going to have to travel all the way to Tennessee. They have no connection to Tennessee, other than the fact that their client, TeamHealth, has some offices there.

Dkt. No. 75 (Transcript) at 67:5-25.

As counsel for Alliant candidly acknowledged, the electronic nature of the evidence in this case diminishes the importance of this factor. *See Beijing Meishe Network Tech. Co. v. Tiktok Inc.*, No. W-21-CV-00504-ADA-DTG, 2023 WL 2903978, at *4 (W.D. Tex. Apr. 11, 2023) (citing *Planned Parenthood*, 52 F.4th at 630; also citing *Texas v. United States Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2023 WL 2457480, at *5 (S.D. Tex. Mar. 10, 2023) (stating the defendants had pointed to no evidence that would be unavailable in an electronic format)).

Considering the accessibility of the limited electronic evidence identified so far, this factor fails to show the Eastern District of Tennessee is clearly more convenient.

(b) Availability of Compulsory Process

The availability of compulsory process or subpoena power to secure the attendance of unwilling witnesses "receives less weight when it has not been alleged or shown that any witness would be unwilling to testify." *Planned Parenthood*, 52 F.4th at 630–31 (citations omitted). The Fifth Circuit has recently reiterated that access to compulsory process for non-party witnesses is the "gravamen" of this factor. *See Bruck*, 30 F.4th at 434 (citing *Garrett v. Hanson*, 429 F. Supp. 3d 311, 318 (E.D. Tex. 2019)).

Ironshore instead focuses on party witnesses, specifically TeamHealth's employees located in Tennessee who assisted in securing insurance coverage for TeamHealth. Dkt. No. 16 at 9

(identifying "David Jones and Carol Owen who wrote to Ironshore related to the *Hernandez* claim"). According to Ironshore, should the matter remain in Texas, Ironshore would not be able to issue trial subpoenas for TeamHealth witnesses based in Knoxville.[3] *Id.* at 10. However, that concern was allayed at the hearing, where TeamHealth's counsel committed to not using the location of its employees as a reason to prevent any employee from testifying in Texas for trial. Dkt. No. 75 (Transcript) at 56:23-25.

For its part, TeamHealth identified numerous Texas attorneys in the *Hernandez* Action it claims will be relevant non-party witnesses. Dkt. No. 17 at 12; *see also* Dkt. No. 75 (Transcript) at 53:12-54:3; 60:1-25; 79:11-25 (identifying numerous Texas attorneys who may be witnesses in this action). Ironshore minimizes, but does not dispute, TeamHealth's contentions that neither the Eastern District of Texas nor the Eastern District of Tennessee would have absolute subpoena power over all potential witnesses. *See* Dkt. No. 20 at 5 & n.7. At the hearing, TeamHealth explained that any "AIG's witnesses," to the extent they are relevant in this case, are also not in Tennessee (Dkt. No. 75 (Transcript) at 54:6-55:1), and Alliant likewise asserted that any of its Texas-based witnesses that are no longer current employees could not be compelled to testify in Tennessee (Dkt. No. 25 at 2).

In sum, Ironshore has failed to identify any specific witnesses who would be unwilling to testify and who would be subject to compulsory process in Tennessee but not in Texas. Considering this and the potential non-party Texas witnesses referenced by TeamHealth and Alliant, this factor fails to show the Eastern District of Tennessee is clearly more convenient.

---

[3] There is confusion regarding the status of the third witness that Ironshore identifies—Linda Epstein. Although TeamHealth's response suggests Epstein is still TeamHealth's Chief Litigation Counsel, Dkt. No. 17 at 11, TeamHealth's counsel clarified at the hearing that Epstein is TeamHealth's **former** Chief Litigation Counsel. Dkt. No. 75 (Transcript) at 52:12-17. Either way, Ironshore does not allege or show that Epstein would be unwilling to testify. What is more, TeamHealth states Epstein currently resides in Florida, not in Tennessee as alleged by Ironshore. Dkt. No. 75 (Transcript) at 52:12-17; *see also* Dkt. No. 17 at 11.

(c) Cost of Attendance for the Parties and Witnesses

This factor is analyzed giving broad "consideration [to] the parties and witnesses in all claims and controversies properly joined in a proceeding." *In re Volkswagen AG*, 371 F.3d 201, 204 (5th Cir. 2004) ("*Volkswagen I*"). Under the Fifth Circuit's "100-mile rule," when the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles (as here), "the factor of the convenience to witnesses increases in direct relationship to the additional distance to be traveled." *Id.* at 204-05.

Ironshore has specifically identified two party witnesses by name (David Jones and Carol Owens) who are in Tennessee (and for whom the cost of attendance of trial will be lower if the case is transferred to Tennessee).[4] Notably, these are TeamHealth employees, whom TeamHealth ostensibly considered when choosing to file the case in Texas. Dkt. No. 17 at 12; *see also* Dkt. No. 75 (Transcript) at 32:4-10. There are also relevant party witnesses for Alliant in Texas.[5] Regarding non-party witnesses, TeamHealth has identified by name other potential "key witnesses" (Texas attorneys who participated in the *Hernandez* Action) for whom trial in Texas would be significantly more convenient. *See* Dkt. No. 75 (Transcript) at 52:23-53:22.

Given the location of the relevant witnesses, this factor fails to show the Eastern District of Tennessee is clearly more convenient.

---

[4] Ironshore also identified Linda Epstein, who TeamHealth explained is a "former" employee who resides in Florida Dkt. No. 75 (Transcript) at 52:12-17; *see also* Dkt. No. 17 at 11. Ironshore has not shown that trial in Texas would impose substantial inconvenience as opposed to trial in Tennessee for Epstein. Further, TeamHealth disputes Ironshore's assertion that either non-party witness Epstein or party witness Carol Owen, whose only involvement to date has been as counsel for TeamHealth, will be a witness in this case. Dkt No. 75 (Transcript) at 52:12-20.

[5] Ironshore and Alliant dispute the location of the relevant Alliant witnesses. According to Ironshore, the Alliant employee issuing the Ironshore Policy is in Alliant's New York, not Texas, office. Dkt. No. 16 at 10, n.1. Ironshore responds that "none of Alliant's witnesses is in Tennessee and the witnesses involved in the underwriting of the policy at issue . . . are all in Texas" who would incur increased costs for a Tennessee trial. Dkt. No. 25 at 2; *see also* Dkt. No. 75 (Transcript) at 65:21-25 (Alliant insisting its witnesses with relevant knowledge are in the Houston office, which is consistent with the "Surplus Lines Broker Name" in the Ironshore Policy identifying Alliant's Houston Office (Dkt. No. 43-3 at 5)). Alliant's argument is persuasive, and even if an Alliant witness is in New York, Ironshore fails to show the difference in any costs of attending trial in Tennessee versus Texas for that employee is controlling.

(d) Practical Problems

Practical problems include those that are rationally based on judicial economy. *ATEN Int'l Co. v. Emine Tech. Co.*, 261 F.R.D. 112, 125 (E.D. Tex. 2009) (citing *In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351-52 (Fed. Cir. 2009) ("*Volkswagen III*")).  Relevant here, the existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh in favor or against transfer. *ATEN,* 261 F.R.D. at 125 (citing *Volkswagen III,* 566 F.3d at 1351).

Ironshore initially argued that keeping this case in Texas is inconvenient because it would require witnesses to be deposed in both the Texas and Tennessee Actions. Dkt. No. 16 at 10-11. Given the Tennessee court's dismissal of the Tennessee Action, there are no longer any overlapping cases that would counsel in favor or against transfer. Accordingly, this factor fails to show the Eastern District of Tennessee is clearly more convenient.

## 2.   Public Interest Factors

(a) Court Congestion

While some courts have found this factor "speculative," the Fifth Circuit has recently affirmed that "to the extent docket efficiency can be reliably estimated, the district court is better placed to do so than [the Court of Appeals]." *Planned Parenthood*, 52 F.4th at 631 (distinguishing *In re Genentech, Inc.*, 556 F.3d 1338, 1347 (Fed. Cir. 2009)); *see also Beijing Meishe Network Tech. Co. v. Tiktok Inc*., No. W-21-CV-00504-ADA-DTG, 2023 WL 2903978, at *7-8 (W.D. Tex. Apr. 11, 2023) (noting the time to trial was faster in the Western District of Texas than in the Northern District of California and further noting the case was moving through discovery and proceeding to trial in Texas).

Ironshore cites the Civil Judicial Caseload Statistics published on March 31, 2021, asserting "the Eastern District of Texas has over 3,291 pending cases whereas the Eastern District of Tennessee has only 1,167 pending cases." Dkt. No. 16 at 11. However, TeamHealth persuasively argues that the "total number of pending cases in a specific Federal district is a poor gauge of a district's congestion. Rather, the median time from filing to disposition more accurately reflects which court can more efficiently handle this case." Dkt. No. 17 at 13.

According to the Civil Judicial Caseload Statistics published on March 31, 2022, the average time from filing to disposition of cases in the Eastern District of Texas was only 8.1 months (1.1 months shorter than the national average), compared to 12.6 months for the Eastern District of Tennessee. Dkt. No. 17 at 13. According to TeamHealth, while the total number of cases pending in the Eastern District of Texas is higher than in the Eastern District of Tennessee (3,067 to 1,102), the Eastern District of Texas terminated a correspondingly larger number over the past year as well (3,321 to 1,213). *Id.* TeamHelath also estimates the Eastern District of Texas has ten active Article III Judges to the Eastern District of Tennessee's five active Article III judges, possibly explaining how the Eastern District of Texas's efficient handling of a greater number of cases. Dkt. No. 75 (Transcript) at 58:9-23.

This case is moving through discovery and has a trial setting in early January 2024 in this district, without any effect from congestion. Dkt. No. 59. The Court finds this factor fails to show the Eastern District of Tennessee is clearly more convenient.

(b) Local Interest

The second public interest factor, which focuses on the local interest in having localized interests decided at home, "most notably regards not merely the parties' significant connections to each forum writ large, but rather the significant connections between a particular venue and the

19

*events that gave rise to a suit*." *Def. Distributed v. Bruck*, 30 F.4th 414, 435 (5th Cir. 2022) (quoting *In re Apple Inc*., 979 F.3d 1332, 1345 (Fed. Cir. 2020) (emphasis added)). Important considerations include the location of the injury, witnesses, and the plaintiff's residence. *Id.* (citing *Volkswagen II*, 545 F.3d at 317–18; also citing *Zurich Am. Ins. Co. v. Tejas Concrete & Materials Inc.*, 982 F. Supp. 2d 714, 727 (W.D. Tex. 2013)). Indeed, "[t]he place of the alleged wrong is one of the most important factors in venue determinations." *Id.* (quoting *Watson v. Fieldwood Energy Offshore, L.L.C.*, 181 F. Supp. 3d 402, 412 (S.D. Tex. 2016)).

On one hand, Ironshore contends the alleged "wrong" claimed in this case is "Ironshore's failure to provide coverage for a settlement entered into by TeamHealth from its offices in Tennessee, that resolved claims under Tennessee fraud statutes, under a policy issued to a Tennessee-based insured under a policy that was designed to provide coverage to a Tennessee-based insured and ultimately delivered to a Tennessee-based insured." Dkt No. 16 at 11. Thus, according to Ironshore, Tennessee "certainly" has a local interest in having the localized interests in this case decided there. *Id.* at 11-12; *see also id.* at 8 (stating the subject matter of this lawsuit is based on actions related to TeamHealth's notification (or lack thereof) to Ironshore of the Demand and *Hernandez* Action and subsequent request for insurance coverage taken by TeamHealth from Tennessee and Ironshore's subsequent denial of that request, "which was directed to Team Health's officers in Tennessee"); Dkt. No. 20 at 4 & n.5 (similar).

TeamHealth responds that "Texas is clearly the nexus of where TeamHealth's harm from Ironshore took place, and Texas has numerous significant connections to the events giving rise to the suit." Dkt. No. 17 at 14. Specifically, TeamHealth states it purchased both the AIG and Ironshore Policies from co-defendant Alliant's Texas office to insure risk in Texas; this lawsuit involves the issue of excess liability insurance coverage arising out of the *Hernandez* Action, an

underlying investigation, Demand, and litigation against TeamHealth in this very district; this lawsuit revolves around the defense fees and costs TeamHealth incurred in the *Hernandez* Action and seeks reimbursement of those defense fees and costs; and the Texas attorneys that defended TeamHealth in the *Hernandez* Action are likely to be key witnesses. *Id.*

Texas's "local interest in having [the] localized interests" in this case "decided at home" is not insignificant. *Bruck*, 30 F.4th at 435 (quoting *Volkswagen II*, 545 F.3d at 315). Even though Tennessee has an interest in the insurance dispute because the policies are governed by Tennessee law and were issued to TeamHealth whose principal place of business is in Tennessee, when taking into account the Texas *Hernandez* Action and that TeamHealth's insurance broker Alliant has an office in Texas, the Court finds the strength of Tennessee's interest in having this case decided at home is no more than that of Texas. Thus, this factor fails to show the Eastern District of Tennessee is clearly more convenient.

(c) Familiarity with the Governing Law

Regarding the familiarity of the forum with the law that will govern this case, Ironshore asserts this insurance coverage dispute should be governed by Tennessee law. Dkt. No. 16 at 12. According to Ironshore, Tennessee courts will be "at least, slightly more familiar with applying Tennessee law than a Texas court." *Id*. at 13. TeamHealth asserts the issue of what state's substantive law will apply to each aspect of this lawsuit has not yet been determined,[6] and federal courts "across the country apply the law of numerous different jurisdictions every day." Dkt. No. 17 at 14. Even if Tennessee law were to apply, TeamHealth would, "at worst," be neutral. *Id. at*

---

[6] In its amended complaint, TeamHealth references both Texas and Tennessee in its bad faith claim against Ironshore. Dkt. No. 43, ¶¶ 80 ("There is no legitimate basis for Ironshore's denial, and Ironshore's conduct is contrary to its obligations under Texas or Tennessee law, including the statutory bad faith provisions in those states."), 82 ("On March 29, 2022, TeamHealth made a demand under Tennessee Code Annotated § 56-7-105(a) and the Texas Ins. Code, including §§ 541.060, 541.151, and 541.152.").

15. TeamHealth also notes it asserts breach of contract and bad faith claims against Ironshore and contends that the Court is familiar with both sets of claims. Dkt. No. 75 (Transcript) at 62:13-16.

"Federal judges routinely apply the law of a State other than the State in which they sit. . . ." *Bruck*, 30 F.4th at 436 (quoting *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 67–68, (2013)). Ironshore does not persuasively show "any exceptionally arcane features of [Tennessee law,] that are likely to defy comprehension by a federal judge sitting in [Texas]." *See id*. The Court cannot conclude that Tennessee's familiarity with Tennessee law "produces [any] meaningful efficiency rendering [Tennessee] a more convenient forum" here. *Id.*

Accordingly, this factor fails to show the Eastern District of Tennessee is clearly more convenient.

### (d) Avoidance of Unnecessary Conflict of Laws Problems

The last public interest factor seeks to avoid "unnecessary problems of conflict of laws [or in] the application of foreign law." *Bruck*, 30 F.4th at 436 (quoting *Volkswagen II*, 545 F.3d at 315). Referencing its own declaratory judgment action in the Eastern District of Tennessee and the possibility of inconsistent judgments, Ironshore contends transfer of this case would avoid any conflict of other laws being applied or inconsistency. Dkt. No. 16 at 13. But there are no risks of such a conflict here, especially considering there is no longer a second lawsuit pending in Tennessee. This last public interest factor is also at most neutral and fails to demonstrate the Eastern District of Tennessee is clearly more convenient.

## C.      **Weighing of the factors**

None of the foregoing factors, individually or considered in combination, demonstrate the Eastern District of Tennessee is clearly more convenient for an insurance coverage dispute

involving conduct related to an underlying action filed in the Eastern District of Texas and involving parties with relevant witnesses in both Texas and Tennessee.

## V. CONCLUSION

Based on the foregoing, it is

**ORDERED** that Defendant Alliant Insurance Services Inc.'s Motion for Joinder in Plaintiffs' Response to Ironshore's Motion to Transfer (Dkt. No. 25) is **GRANTED**. It is further

**ORDERED** that Ironshore Specialty Insurance Company's Motion to Transfer and Supporting Memorandum of Law (Dkt. No. 16) is **DENIED**.

SIGNED this the 17th day of May, 2023.

J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE